310-0897 Heritage Square Development, Appellant James LaFontaine v. ZUZU, Inc., et al. Appellee Andrew Evans. Mr. LaFontaine. Thank you. Your Honor, Appellant, please report. My name is James LaFontaine. I represent Heritage Square Development, LLC in the case before the court today. The main issue before the court, I believe, today, the most important issue, is whether or not there was economic duress applied to Mr. Monadnac during the time period in question. And I think that to be able to analyze that, the court needs to be cognizant of a few things. One, the original lease is a commercial tenancy. It was entered into back in April 1st of 2009. There's no allegations that that lease was entered into under duress. That lease contains some provisions that require financing for tenant improvements on the property. In this case, the agreement was that the landlord would do what's called the white envelope, basically get the commercial property ready to go so that the tenant can move in. But in Mr. Monadnac's case, he asked for an additional $56,000 in tenant improvements being conducted on the premises so that he could put in his liquor store. The parties agreed that that would happen, and there's an agreement in here in the lease and in the addendum, specifically addendums three and four, that deal with that. Addendum three dealt with payments for the tenant improvements. And what was supposed to happen was the appellee, Mr. Monadnac, was supposed to either get financing himself for the tenant improvements, or he was going to work with the landlord who was going to try to get financing for him. And if they were able to obtain financing, then the work could proceed. If they were unable to either get financing for the work or get the work done, Mr. Monadnac had the option of just terminating the lease. What actually occurred here, and I think it was the plan from the inception, was that the landlord was going to try to get financing to do the tenant improvements. And the tenant improvements would be repaid back over a period of time, every month, an extra approximately $1,000. $999. Yes. And so that was, I think, the original intent. What happened was Mr. Monadnac gave the Heritage Square personnel some paperwork, some financial statements. They took it to their bank, which also happened to be called Heritage Bank. Is there a relationship between the bank and this object, Heritage Square? No, I don't think that there is a relationship other than as a customer-bank relationship. No interlocking directors? No, not that I'm aware of. And there was no testimony or evidence put into the record about that. So what happened was the bank came back to Heritage Square and said, Look, we're willing to loan the money. However, we want a personal guarantee from Zuzu and Mr. Monadnac. At that point, that information was relayed to Mr. Monadnac in the middle of May of 2009. Mr. Monadnac was represented by counsel at that point in time, Mr. Stephen Vogel. Mr. Vogel wrote a letter to Mr. Lewis indicating, it was just a simple one-line letter, Where in the contract does it require a personal guarantee? Mr. Lewis received that correspondence. He turned around the next day and sent a letter back to Mr. Vogel, the attorney for Mr. Monadnac, and indicated that his client had chosen to exercise the addendum to do the tenant improvements and that because he had done that, he had to comply with section 16.19 in the lease, which required that he get financing, ensure that he could get financing. And he further explained that he tried to get financing through Heritage Bank, but that Heritage Bank could only make that loan for the tenant improvements if Mr. Monadnac signed a personal guarantee. And he indicated furthermore that, look, if he doesn't want to go through Heritage Bank, he can go through whatever bank he wants. He doesn't have to use Heritage. And if he doesn't use Heritage, then he doesn't have to sign a personal guarantee for me. I don't need that. I'm available if you want to talk to you more about this. Immediately after receiving that letter, Stephen Vogel, the attorney for Monadnac, sent a letter back to Mr. Lewis indicating, my client, Suzu, and Mr. Monadnac are both willing to personally guarantee the tenant improvements in the sum of $56,000. It's a very clear statement. We're willing to do it. Mr. Monadnac was represented by counsel. Nowhere in the two letters that Mr. Vogel wrote is there any indication that Mr. Lewis or anyone at Heritage had prevented Mr. Monadnac from gaining access to the premises. And I think it's something important to point out to the court, too, that under the lease, at that point in time, he didn't even actually have possession of the premises, meaning Monadnac and Suzu. They hadn't paid one dime in rent. They weren't operating out of the facility yet. It was still under construction. The white envelope was still being done. But they were looking forward to doing the tenant improvements. So, you know, I think that Mr. Monadnac wanted to paint this as if he was locked out of his store. All Mr. Lewis and Heritage Square were doing was following through on the lease agreement. And 16.19, which is what they were following, says it's a condition proceeding. So this has to be fulfilled before the lease can go forward. So he simply asked that he comply with the requirements in the lease. And so he said, look, I need a personal guarantee. They turned around and said right away, we'll sign it. They don't hear anything else from Mr. Monadnac until he receives in June 3, 2009, a personal guarantee signed by Mr. Monadnac and Suzu and actually written up by his own attorney, Mr. Vogel. At that point in time, then they're able to start proceeding with the buildout, with the tenant improvements. That's the testimony that Mr. Lewis gave. He wasn't going to start the tenant improvements until he knew that he had a personal guarantee so the bank would loan him the money. I think it defies common sense and logic for Mr. Monadnac to argue that he was locked out of the loan premises because he wouldn't sign the guarantee for this loan. But at the same time, the landlord already started doing work on the tenant improvements for which he was waiting for this loan for. How far along were those improvements? At what point? At what point? At the time that this alleged economic duress began. Well, the tenant improvements had not begun at all. Mr. Monadnac claimed that when his attorney was writing these letters that he allegedly was locked out of the building. He didn't have access to the building. Again, that was his testimony at trial. Again, there's nothing in the letters from Mr. Vogel saying, you know, you've locked my client out. How dare you? There's no police report filed. There's no lawsuit filed. There's nothing. And Mr. Monadnac was good friends with a police officer as well who testified at trial that Mr. Monadnac hadn't even mentioned his loan. But he's a good friend of eight years. At that time, none of the improvements had been done? Only the white envelope work was being done. But none of the tenant improvements had been done? No, Your Honor. No. I mean, my client. I'm talking about the work that was the work we're talking about here. Right. No. None of that work had been done. My client testified clearly at trial that he wasn't going to start that work until, one, the white envelope work was done. And, two, he had a signed guarantee. Otherwise, he'd be putting $56,000 worth of work into a building that may never even be leased out, for which he didn't have a signed guarantee that the bank required before they would loan the money. So, again, none of that work had been done. So most of the work, the so-called white envelope stuff, most of this was done. And about the time that the tenant was to begin his own work on it was when this lockout, or alleged lockout, occurred. Is that, have I got the timing more? Yeah, I think you do. I think you do. It was never, well, I can tell you that it was never really clear from the testimony at trial when the lockout occurred. Mr. McNabnat nor his witnesses could really enunciate a specific date when the lockout started or when it ended. It was very unclear to me, and it's unclear to me in the record what time period that covered, although he did testify that when Mr. Vogel was writing these letters that he'd already been locked out. So it's sort of, it strains credibility to think that someone's locked out, and they've got a lawyer representing them, and there's this issue about personal guarantees, and yet the lawyer isn't saying anything about it. But the lease term begins April 1st, and... I understand that if you look at that, but if you look at it doesn't... There's a commencement date of May 1st where he takes possession, and it's my understanding that the white envelope work was done about that time, finished by about May 1st, but isn't this a period of time where he alleges lockout between May and June? I think it is between May and June, however. There was no testimony that the white envelope work was done by May 1st. The testimony is that was still going on up until early June. They were still doing the white envelope work. And I would point out that in the lease addendum number four, that talks about the commencement date, and that's what's important. The term commencement date shall now mean later of April 15th, 2009, or the first day of the month following the month in which the construction of the building and leasehold improvements are substantially completed by the landlord. What's also important to point out is that when he was finally billed for taking occupancy of the premises, he was billed starting June 9th. That's when the bill for his monthly rent began to run, June 9th. He paid on July 9th for the period of June 9th through June 30th. So arguably that's when his tenancy truly took effect. Are we talking about 2009? Yes. I'm sorry, did I say 2009? You didn't say any year. Okay, I'm sorry. I just wanted to follow your argument. Yes. And that was undisputed, the time period for which he paid rent. It started June 9th. When did you get possession back? We didn't get actual possession back until the date that we got an order. I think it was in January or early February. February 2nd of 2010. Yes. And yet when you had a judgment later, the judge allowed rent from March 2010, April 2010, May 2010, June 2010, July and August. Plus late fees, $775 a month. You had possession. No, I don't think that the judge... I'm just looking at the exhibit and I'm comparing it to the judgment of $86,000 and I can't figure out how you were awarded $86,000 when you got, including back rent, and $44,000 due on the loan as to the corporation when your client had possession as of February 2010. Okay. So when I look at this duress issue, I look at the end result of the forcible proceeding and it looks like the corporation's judgment was really inflated. Can you tell me how that happened? Well, I'll try to do that. Thank you. Number one, I think that the judge actually gave us an award for the $56,000 plus intended improvements that were never paid. That's number one. And then I believe that there was also a large amount due... that is named on the lease and not Mr. Ziad individually. We only got a judgment against the corporation for that amount. Ziad was not named for those things. Why is he a part of the forcible proceeding when he's not named on the contract? I just don't understand. Sure. We thought that we brought an action to enforce the guarantee at the same time that the forcible entry detainer was brought. And the court heard all of the evidence altogether. I think thinking that it was in the interest of judicial economy to hear all the evidence... So the corporation was ordered to pay the entire amount of that advance. Correct. The corporation was ordered to pay... And now you want us to order Mr. Ziad also. Correct. Because the lease required that he... Well, the lease required that he satisfy the section 1619. Who was a party to the lease? The corporation was a party to the lease. However... And so the corporation had to get financing. Right. But the lease also indicates that if the corporation can't get financing for the tenant improvements, then the landlord... Then everything's null and void according to the lease. Correct. And so the corporation, the owner of the corporation, Mr. Menagna, wanted to be able to go ahead with his project, wanted to put his liquor store in there. My client says, the bank requires you to personally sign so that we can guarantee for the tenant improvements. Counsel has two minutes. Thank you. And so we simply asked that he do that. He also said to him in the letter, look, you don't have to do that. You can go get your own financing. So he had choices. Economic duress is a matter of whether or not someone has choice, free will. He could exercise his free will. He could have got his own loan. He didn't. He had several weeks, if not months, to obtain financing. And he had several weeks to decide what to do once my client came to him and said, we need a personal guarantee. And he had the option of just simply canceling the lease. He chose to execute a personal guarantee, which then put my client on the hook for $56,000. And then he took possession of the premises and enjoyed the use and benefit of the $56,000 worth of work. And then when his business didn't go well and he wasn't paying his bills, he wanted to leave and not pay the bill. He wanted to get out of it. But he could leave. He's not named on the lease. It's the corporation. That's the benefit of having corporate status. Correct. But he signed a personal guarantee. And now he wants out of the personal guarantee. That's the issue that we have here. The issue of economic duress was brought up the day before trial. He had two other attorneys before the third one that tried the case. No one had ever mentioned economic duress. There's not one mention in one shred of evidence, one piece of paper, nothing. And during the time of the tenancy, prior to the tenancy, or after the tenancy, it's all the day before trial. Counsel's time. Thank you. Any more questions? Thank you, Mr. LaFontaine. Ms. Evans. Thank you, court, counsel. I am Angela Evans, and I represent the defendant, Zia Badman, in this case. First of all, I just want to address what the plaintiff left off with there, which was that the economic duress issue was not brought up until the day before trial. I also want to mention that throughout that whole course of time that that proceeding was going on, there was not a single bit of discovery conducted. And I was the third attorney that came into the case. The trial court granted judgment in this matter in favor of defendant Zia Badman based upon two grounds, that the guarantee was entered into under duress and without consideration. The trial court's judgment states that the two versions of the facts surrounding the circumstances of how this guarantee was entered into cannot be reconciled, and that the versions put forth by the defendant were more credible. Today the plaintiff is asking this court to reverse the trial court's findings on both grounds, the duress and that it was entered into without consideration. And he's arguing this, arguing that the evidence of the plaintiff was stronger than the evidence of the defense. A lot of what we just heard is the same thing that we've heard in the briefs. It's all about the facts. The trial court heard the facts and said that the version of the defendants were more credible. Under the duress issue, plaintiff is asserting in the first issue of its brief that the trial court erred in finding that Zuzu Inc. was locked out of the leased premises. Again, the trial court's judgment states that it found two versions surrounding the execution of the guarantee to be irreconcilable and that the versions presented by the defendant were more credible. As such, the court's judgment was based upon the totality of the evidence, not merely the lockout that occurred. So what I'm speaking about here is that the way the first issue is framed is it sounds something like, you know, if this lockout occurred then or did not occur, there is no duress. Now, there's four witnesses that came in and testified that they were with Z.A. Madmine, and you're right. It is the corporation, but Z.A. Madmine was the president and had scheduled deliveries, and at one time he had a police officer with him who was bragging to the police officer. The other guys were either trying to deliver something or get into work in the premises, and they couldn't get in. And Z.A. Madmine was not able to let them in. The sergeant body testified at the trial that, you know, they pulled on the door, tried to get in, and they were unable to get in. And it was in Z.A. Madmine testified that the landlord would not let him in. But back to my point, it was the totality of the evidence upon which the judge found that decision. In other words, the court's judgment found that duress was present after listening to all of the facts surrounding the execution of the personal guarantee, not merely the lockout to which plaintiff directs the court's attention in the first issue. Case law supports the trial court's reasoning here in that case law has stated that the existence of duress generally is one of fact to be determined in light of all the circumstances surrounding a given transaction. That's Schlossberg v. Yale Trindle and Associates. It's a 1995 case. Further, four witnesses testified for defense that Madnot was unable to get into his building. He had possession. He had stuff in there. He was working. They were getting ready to open up. And, you know, and so there's plenty of evidence there that the lockout occurred for which the trial court based that decision. If that was the only reason that he was going to base the duress decision on was that that lockout was the wrongful act. But, in fact, he looked at several factors. Plaintiff fails to mention the other facts showing duress which were proven by the defense, such as the threats, repercussions of not signing the guarantee. For instance, testimony proved that Mike Lewis told Madnot that his lawyer was a Smith and Wesson. He said to sign or else. It's kind of like your law school definition of put the gun to your head and do it. You know, it's one of those textbook things of, you know, sign or else. My lawyer's a Smith and Wesson. I don't know that there's many law school cases that would get as close to that. So it was kind of an interesting thing to me. Another fact showing duress is Madnot's investment in merchandise in the time that was already in the time that he had already put into that store by the time the doors were locked and the guarantee was sought to be signed. Madnot's counsel also failed to advise him of options available other than the signing of the guarantee. Plaintiff is asking solely for a reversal based on an argument that the trial court's decision was against the manifest weight of the evidence. Plaintiff ignores the consistent testimony of four witnesses and points to the omission of certain language in letters, references things that he thinks should have happened that did not, in letters from an attorney who was not called to testify to support his prayer for a reversal today. Plaintiff wants this court to reverse the trial court because of assistance of counsel and because of a letter that Zia's attorney wrote stating that he was willing to sign the guarantee. However, plaintiff did not call Steve Vogel, who was the attorney for Zia Madnot at the time of the signing of the guarantee, to testify about the circumstances surrounding Zia's decision to sign the guarantee. However, there is evidence in the record showing that Madnot did not want to sign the purported guarantee. Zia Madnot testified to this. He communicated to his attorney, Steve Vogel, and Vogel nor anyone else advised Madnot of any options to get the doors unlocked other than to sign the guarantee. And I'll mention at this point that you'll see that you saw in the briefs that Mr. Madnot had owned some businesses and stuff. He is a business owner, but he also, what shows in the transcript, is having a really hard time speaking and can barely, I mean, he can read, but just not very well. So the record does not contain evidence that proves that Madnot was advised by his attorney of any other options. What is there is what Zia Madnot says, which he says, his attorney, he threw the papers in the air, he said, I don't want to sign this, and that his attorney said, you've got to sign it to get the doors unlocked. Both parties, the plaintiff and I, cited Joyce and LaVeach, Kaplan, and Ogilvie in our briefs. Why? The plaintiff quotes these cases because the plaintiff is arguing that there was a lack of evidence of a wrongful act, that the lockout did occur, and the immoral threats. He's saying that, you know, the sign or else, and my lawyers, Smith and Wesson, you know, all of these acts of economic duress didn't happen. That they do not exist, and that defendant had a choice. So then we're back to another fact question, which is what I was saying earlier. I mean, this is all about the facts. Did the testimony establish that Zia had an option? Was there a wrongful act? Were there immoral threats? We are not arguing that the law is different here between the two of us. The parties are disagreeing as to the facts. Defendant quoted, and I reiterate that we're saying the facts are different, and the trial judge said, I know they're different. I can't reconcile them. These are the ones that are more credible and found for Zia Madman. Defendant quoted those cases because the testimony presented by the defendant at trial, which the trial court said was more credible, proved a wrongful act of locking the doors. It proves that the threats were immoral. All the circumstances surrounding the execution of the guarantee pointed to it being entered into under duress. Again, we are discussing factual determination and credibility of witnesses. Factual findings in the trial court that are reported great weight on appeal and should not be disturbed if there's any evidence to support them. There is evidence here. There's plenty of evidence here. Talking about the without consideration finding of the trial court. The trial court found that the guarantee was without consideration based upon all of the circumstances surrounding the execution of the purported guarantee. I go back to the way he wrote the judgment, saying I looked at all the circumstances. I find that it was entered into under duress and without consideration. What was the consideration in this document? It's unclear. The purported guarantee at issue is a letter, the drafter of which is unidentified in the document. And it consists of one vague sentence. It says Z&I Inc. and Zia Madman hereby guarantee the tenant improvement charges totaling $56,436 per lease addendum number three. Signatures. Lease addendum three adds nothing else to what the terms of the actual guarantee are. Plaintiff's complaint, the guarantee, the lease addendum number three, nor testimony in the record or documents presented at trial tell us any of the following. They don't tell us the terms of the guarantee. They don't tell us what was to be paid. Was it the tenant improvement charges to Heritage Square or was it loan payments to the bank? How the loan or improvement charges, whichever it was, was to be paid. It doesn't tell us if the loan was actually ever made here. I mean, the loan's not in evidence. We didn't get testimony that Heritage Bank actually did ever follow through and loan money here. And if that is the thing here, how come the action is brought by Heritage Square Development here? Wouldn't the bank own the action on a guarantee? I mean, look, we don't even know who the parties are here. It's like the lender would be the bank and then Zia's guaranteeing and the person who received the money, I guess it was Mike Lewis or Heritage Square Development. It's not really clear to me who the parties was. Who was the obligor? Was the guarantee accepted? Where's the default here? You know? I mean, we talk about the default on the lease. And that's the funny thing. I understand where you're coming from. It is confusing here because those actions were improperly joined. And I argued a bit. I was brought in a little late to the game. But, you know, the forceful entry to retainer action and having the guarantee together in one is convoluted. I understand. But that's the way it played out. It's just confusing. Whether the consideration for the guarantee was a loan, the tenant improvements, or the tenant improvement charges, we don't know. None of this was proven. So, yeah, the guarantee was about a section of the lease having to do with improvements. We know that that was we've had that we have testimony that we're trying to get these improvements done, that Lewis and them want this guarantee created to pay for these improvements. And we know that because it was when Vogel wrote that letter to Lewis and said, the attorney from MADNOT at the time, and said, you know, why do we have to do this personal guarantee? He wrote back and he said, because the bank has to have it in order for us to get the loan. But there is no testimony in evidence that a loan was actually made or that the loan was defaulted. The evidence at trial showing there was not consideration and lack of evidence at trial showing there was consideration supports the trial court's decision that looking at all of the circumstances surrounding the execution of the purported guarantee, the guarantee was without consideration. The factual findings. How was that issue raised? Sir? How was that issue raised procedurally? The lack of consideration issue? Well, it was mentioned in argument, but was most heavily discussed in the evidence presented at trial. The trial court found this guarantee to be entered into without consideration, not failure of consideration. In other words, the trial court found that the plaintiff did not prove consideration, the elements of a valid contract. So it was mostly during the evidence. I guess I asked questions about and Mr. Lafonte put in evidence about the consideration. I mean, you could say that looking at the document itself, you can't tell that there was consideration. And I say make the distinction between the failure and without consideration because failure of consideration is an affirmative defense under Illinois law. And that is as. But lack of consideration being without consideration is not an affirmative defense, which has been put in place. OK, well, and so so telling you where it came up in the argument. I don't believe I waived it. There is case law saying that I didn't have to plead it as an affirmative defense. It is an element of a valid contract. And I'm not saying that there's a failure of consideration and the judge found that the guarantee was without consideration. It wasn't heavily discussed in argument, but it was there. It was there in the evidence that we don't know what it is. I mean, we I mean, you say that it's related to the tenant improvement charges and when they were done. But I mean, you're thinking about a normal guarantee as a financial contract. I mean, you're trying to guarantee the tenant improvement. And so you think that the actual consideration is not the tenant improvements being done. It's the fact that the loan was made to finance those tenant improvements. And so it and those were the questions that came out in testimony. Those are the things that are shown in the documents that are presented in evidence. So I guess the short and sweet version is I did mention it in argument. It was not mentioned before then, except heavily in that. It was not mentioned in the pleading stage. It was not mentioned in his complaint. OK. So what we asked this court to do today is to not just outright reverse the trial court because there was evidence there that he that the trial court could rely on. In the standard review on a rehearsal, which is what the plaintiff is asking for, is manifest way to the evidence. The factual findings of the trial court, which found that the totality of the circumstances surrounding the execution of the guarantee indicate that it was entered into under duress and without consideration. I don't think it should be disturbed. Illinois law states that the trial court's factual findings should be given great weight and that the findings of the trial court in a bench trial should not be disturbed if there's any evidence to support them. The trial court's findings are strongly supported by evidence. And the trial court stated in its judgment that it found the defendant's version of the evidence to be more credible than the plaintiff's. I respectfully request that the judgment of the trial court against the plaintiff be affirmed and an order be entered awarding the cost of the seat and for the defendant. Thank you, Ms. Evans. Mr. Refante. Thank you. Was there a document admitted during trial that was the personal guarantee? Yes. Signature? Yes, there was. And it's in the record? It is in the record. Is it possible he signed on behalf of the corporation? No, it's not. Can I grab my? Yes, there was a document. I think counsel mistakenly said that we didn't know who it was from. It was actually drafted by Attorney Vogel, his attorney, and given to us. I did ask Mr. Mineta where he signed that, thinking that, you know, if he was under duress, that, you know, he might remember where that was done. Was it outside the doors of his business or where? He couldn't remember. I think what the court has to keep in mind here, what's most important, is regardless of whether or not you find that there was a lockout, let's assume for the sake of argument there was a lockout. 1619 was a condition precedent to getting possession of the property. It was a condition required before he had possession. Either he had to show that he could get the financing himself or he had to show that he had to submit to the landlord's request to get the financing. That's what would happen here. The lockout wasn't unlawful. If there was a lockout, he had the right to refuse to allow the tenant to move into the property if that wasn't done, and it wasn't done here.  He hadn't paid any rent. He had counsel who indicated that he would willingly sign the guarantee. And he had ample time between May 19th and June 3rd to consider his options. He had other options. That's what economic duress is about. The courts only find economic duress where someone has no options and there's an unlawful pressure. Here there's no unlawful pressure. He was doing what he could do under the lease. With respect to consideration, I also disagree with counsel. The issue was never raised, not in the pleadings, not in any argument before the trial court, and certainly not in closing arguments. After closing arguments were done, the trial court said, if you want, you can submit a brief supporting your closing arguments. I don't want to hear any rebuttal. I don't want any other briefs. Defendant's counsel submitted a brief, and there for the very first time she submitted one paragraph at the very end of the brief that said, oh, by the way, there was no consideration. Apparently the judge liked that and decided there's no consideration here. But it was never raised until after I was told you can't make any further arguments. And so I did not have a chance to respond to that. And I believe the evidence clearly showed that tenant improvements weren't started until after the guarantee was received. The guarantee was received June 3rd. It defies logic to think that the landlord would undertake $60,000 in tenant improvements prior to getting the guarantee that the bank required. It just makes no sense. So under the circumstances, I'm asking this court to find that there was no economic arrest, that Mr. He could sign the guarantee. He chose to sign the guarantee. One other point that was raised that I think is just, I've got to address it before this court, but the issue about why didn't the plaintiff call the defendant's prior counsel to testify at trial? Well, I would say to your honors that if there were such strong evidence to help the plaintiff, that he should have called his own attorney. I certainly didn't know at trial that he was going to waive his attorney-client privilege in the middle of trial and testify about things that he allegedly told his counsel. So that's why I didn't call him as a witness. And I posed the question to the judge at the time, hey, your honor, I think what's odd is, is that they didn't call. I mean, who better than an officer of the court to come and give evidence to this court of whether or not there was a lockout? What I had in my hands were several letters from Attorney Vogel that supposedly were written when the lockout was occurring that didn't make any mention of a lockout and simply said, we'll guarantee it. There's no argument from Mr. Vogel saying anything other than my client will personally guarantee the tenant improvements. Counsel has one minute. I'm asking this court to reverse the trial court and find that there was no economic duress and to find that there was consideration for the personal guarantee and to hold Ziad bin Abnab responsible for the $56,000 in tenant improvements that he requested. How many months of rent did he actually pay? I think he only paid about four months of rent. He was in there from June 9th, 2009 until December of 2009. And I think by December he was behind, I think, two months. $990 of every rent payment was for the loan. So why are you asking for the full amount when by your own statement he made for at least four months that included, let's say, approximately $4,000 towards the principal? No, because, and actually if you'll look, you'll see the exhibit is in here that shows his payments. First of all, his payments were broke down to the loan payments, which was $990 a month, plus his tenant charges or tenant expenses, which was a different amount, as well as CAM charges and other charges. He paid sporadically and paid in different amounts at different times. My client's bookkeeper did the best she could to try to keep records and apply the amounts as they came in to whatever she thought that he was trying to pay towards. We're not asking for anything more than what we're entitled to here. Thank you. All right. Thank you, Mr. O'Connor. We thank you both for your argument today. We will take this matter under advisement.